UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

TIMOTHY D. ALLEN,                    )
                                     )
            Plaintiff,               )
                                     )
      v.                             )        No.  1:11CV106 TIA
                                     )
MICHAEL J. ASTRUE,                   )
COMMISSIONER OF SOCIAL SECURITY,     )
                                     )
            Defendant.               )

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) for

judicial review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II

of the Social Security Act and for Supplemental Security Income benefits under Title XVI of the Act.

The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On September 11, 2008, Plaintiff filed applications for Disability Insurance Benefits and

Supplemental Security Income, alleging that he became unable to work on February10, 2008 due to

a hurt back. (Tr. 52, 86-97)  The applications were denied on October 23, 2008, after which Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 49-56, 59)  On March 3,

2010, Plaintiff testified at a hearing before the ALJ.  (Tr. 20-48)  In a decision dated April 22, 2010,

the ALJ found that Plaintiff had not been under a disability from February 10, 2008, through the date

of the decision.  (Tr. 10-19)  The Appeals Council denied Plaintiff's request for review on May 23,

2011.  (Tr. 1-3)  Thus, the decision of the Appeals Council stands as the final decision of the

Commissioner.

## II. Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel, who first examined Plaintiff. Plaintiff testified that he was 46 years old with a high school degree. He last worked in February of 2008 as a delivery tech at Apria Healthcare. His duties included delivering oxygen, beds, and medical equipment to patients in their homes. Plaintiff stated that he lifted weights ranging from 5 to 180 pounds for six hours a day. He lifted 180 pound oxygen tanks about once a day. Plaintiff was terminated from his job, purportedly due to erroneous paper work. He stated that he had just returned from a two week medical leave and was on light duty. Plaintiff sustained a lower back injury in 2007 and filed a workers compensation claim. He received treatment through the Brain and NeuroSpine Clinic in Cape Girardeau, Missouri but did not undergo surgery. The injections and conservative treatment provided only short term relief. (Tr. 23-26)

Plaintiff testified that his back problems caused severe pain in his lower back when he walked, stood, or bent down. The pain radiated down is right leg, which went numb from time to time. Whenever he was on his feet doing housework, his legs would start tingling after about 15 to 20 minutes. Even when sitting on the couch watching TV, he could not maintain a good position without feeling pain. On a scale of 1 to 10, Plaintiff rated his average back pain as a 5, and if he was moving, the pain was 6. He agreed that his physician reported objective findings at L4, L5, and L5S1. In addition, Plaintiff described radiating pain up his spine, with tenderness and pain. He also had pain in his right leg from his hip to his toes. His leg went numb "whenever it wants to." Walking around relieved the numbness but not the pain. (Tr. 26-27)

In 2007, physicians ordered Plaintiff not to work on several different occasions, ranging from one week to one month at a time. During these times Plaintiff received therapy. The last time he

returned to work, he had been off for 2 weeks and had restrictions to lift no more than 10 pounds with no continuous bending or stooping and no driving over 10 miles. He was terminated after he returned. After his treatment with Brain & NeuroSpine Clinic ended in July 2008, Plaintiff received treatment from his family doctor, Dr. Steven Smith. Dr. Smith gave Plaintiff steroid shots, which did not relieve the pain. Plaintiff further testified that a Dr. Cleaver performed tests and indicated that Plaintiff's back did not require surgery at the time but that he would need more procedures burning the nerves. Plaintiff tried to contact the Brain & NeuroSpine Clinic, but the doctors could not treat him because he did not have insurance, other than Medicaid, which the clinic did not accept. Plaintiff had to pay out of pocket, and he did not have any income. He relied on his wife's disability income. (Tr. 27-30)

Plaintiff further testified that he underwent single bypass open heart surgery in 2006. He experienced severe pains in his chest since the surgery. His cardiologist indicated that Plaintiff had no heart problems and that the pain could be arthritis or nerve damage from the surgery. Plaintiff's rheumatologist stated that the pain was not from arthritis in the chest and advised Plaintiff to return to his surgeon. Dr. Bender, Plaintiff's heart surgeon, noted that the incision was good and did not know why Plaintiff experienced chest pain. Dr. Bender could take out the wires but did not recommend doing so. (Tr. 30-31)

Plaintiff stated that the pain in his chest affected his every day life. He was unable to do dishes, and he had trouble getting dressed and rolling over in bed. The chest pain interfered with his ability to get dressed because the pain was so intense, he could not touch his chest. He testified that his chest radiated on a scale of 8 and above. To get out of bed, Plaintiff had to use his elbows, as if he just returned from surgery. The pain had become worse since the surgery. Plaintiff tried to work

through the pain, but it became so bad he could not deal with it. (Tr. 31-32)

Further, Plaintiff testified that he could sit for 15 to 20 minutes before needing to walk around and stretch due to numbness in his leg and throbbing in his back. He believed that laying in bed and watching TV helped. During the day, Plaintiff spent about 4 hours in bed. He spent 8 hours in bed at night but did not get an 8-hour night's sleep. Plaintiff could stand for 20 to 30 minutes walking and moving around, but his back would tighten and become painful. Moving affected his chest as well because the bouncing radiated the pain. In addition, Plaintiff experienced swelling in his ankles, which was worse on the right. Physicians attributed the swelling to the heart surgery. If Plaintiff elevated his feet, the swelling went away. However, he experienced swelling four or five times a day, or whenever he was on his feet. Plaintiff tried to walk for exercise but could only walk four or five blocks before needing to get back. (Tr. 32-34)

Plaintiff was not under a doctor's care for his cardiac problems. His last appointment with his cardiologist was two months before the hearing. He continued to see Dr. Phillip Taylor for follow-up, who diagnosed a deteriorating disc and osteoarthritis. Plaintiff stated that he had knots and redness on his fingers. He could not open a soda bottle or a jar. In addition, he had knots on his knees. If he squatted, he had difficulty getting back up. He experienced stiffness, pain, and swelling in his knees when he squatted down. Plaintiff testified that Dr. Smith referred Plaintiff to Dr. Taylor to be tested for rheumatoid arthritis. However, the blood work was negative for rheumatoid arthritis, and Dr. Taylor advised Plaintiff to follow up with his primary care physician. (Tr. 34-36)

With regard to his past work, Plaintiff testified that he worked for Apria Healthcare for about 1 ½ years. He stated that if he had not been terminated, he would still be unable to perform the work because he was unable to drive or bend to unload the tanks, concentrators, and beds. Plaintiff also

previously worked for Heartland Healthcare for 2 years delivering medical equipment. Before that, he worked for Wallace & Owens, a supermarket. He worked in the produce department, unloading trucks and stocking shelves. The heaviest weight lifted was 40 pounds for about 4 hours in a workday. Plaintiff worked there for almost 6 years. Prior to working at the supermarket, Plaintiff operated a machine to test parts and drove a fork lift at Borg Warner Automotive. He worked there for 5 years. Plaintiff testified that he was unable to work either of those jobs in his current condition because he could not constantly walk, stand, lift, or work with small parts. (Tr. 37-40)

In addition, Plaintiff stated that he had poor vision in his right eye. He saw Dr. Thomas Miller every six months. However, Plaintiff last saw Dr. Miller a year ago because Plaintiff did not have insurance. On a typical day, Plaintiff tried to sit up and watch TV and tried to do a little housework. He had to lay down 3 to 5 times a day to relieve pain. He went to the coffee shop with his father for 30 minutes and went to the grocery store when he was able. He stated that he did not have much of a life because of his health condition and lack of finances. Plaintiff tried to avoid working in the yard but was able to use the riding lawn mower. His wife and 73-year-old father had to help with the mowing. Plaintiff lived in a house with his wife, who did the cooking. (Tr. 40-43)

Plaintiff testified that he saw his family doctor for anxiety and depression. Plaintiff was prescribed Cymbalta and anxiety medication, which he took 3 times a day. He stated that the depression and anxiety caused fatigue and stress. He was kind of depressed from the pain and his financial situation. Plaintiff expressed a desire to get health insurance to receive treatment and get better. (Tr. 43-44)

The ALJ also questioned Plaintiff, who testified that he was receiving Medicaid. He was denied unemployment after his last job. Plaintiff's only income was his wife's disability, which she

received due to Scoliosis.  (Tr. 44)

In addition, Plaintiff's wife, Tori Elizabeth Allen, testified on Plaintiff's behalf.  She stated that she and Plaintiff had been married for 10 years, during which time Plaintiff underwent back treatment and heart surgery.  Ms. Allen needed to help Plaintiff with cutting the grass, working outside, opening jars and bottles, and tying his shoes.  She helped open bottles, such as two liter soda bottles, and pickle jars every day.  He experienced problems with his hands over the past year.  In addition, Plaintiff had problems lifting things due to his back.  Plaintiff could no longer stoop down to help wash the dog.  Plaintiff went grocery shopping with his wife.  They would walk for as long as they could and left when his back started hurting.  Ms. Allen carried in the groceries, although Plaintiff could carry in about 2 bags.  Plaintiff complained of pain every day.  (Tr. 45-48)

 In a Disability Report – Adult, Plaintiff reported that, due to his hurt back, he could not do anything without a lot of pain, and he was unable to do any enjoyable activities.  He stated that his back condition caused him to be on light duty at work and to take off work.  (Tr. 134-35)   Plaintiff listed his medications as Atenolol, Crestor, Prilosec, Lotrel, Ranitidine, Gabapentin, fish oil, Aspirin, Tramadol, and Naproxen.  (Tr. 182)

In a Function Report – Adult, Plaintiff reported that he did not do a lot during the day.  He tried to help with laundry and dishes, and he visited his parents next door.  He cared for his pets by walking, feeding, and talking to them.  Before his condition, Plaintiff could perform a variety of sports, walk long distances, and work.  He could prepare sandwiches and cereal weekly.  In addition, Plaintiff did dishes and laundry, as well as a little dusting, but with constant pain.  He performed these chores 3 times a week, and the chores took 2 to 4 hours.  He reported that he rode the lawn mower only for short times, and his parents helped with most of the lawn work.  Plaintiff went outside, drove

short distances, and shopped for groceries. He could handle money. Plaintiff's social activities included going to church 3 days a week, watching TV, and visiting with his parents every day. He further reported that his conditions affected his ability to lift, squat, bend, stand, walk, sit, kneel, and stair climb. He believed he could lift 5 to 10 pounds, walk 1 block before needing to rest for 5 minutes, and pay attention for 1 to 2 hours. He was able to follow instructions and get along with authority figures. He rated his ability to handle stress as fair and changes in routine as good. Plaintiff stated that he was always in pain, the more he moved, the worse the pain became. He also mentioned chest pain from previous heart bypass surgery. (Tr. 143-50)

### III. Medical Evidence

On May 15, 2006, Plaintiff underwent a left heart catheterization, ventriculography, and selective right and left coronary angiography. Dr. Billy A.F. Hammond advised Plaintiff to return in 4 to 6 weeks, and if he had poorly controlled angina or a positive stress test, further action would be necessary. (Tr. 373-79) Plaintiff was admitted to Saint Francis Medical Center on June 30, 2006, after an abnormal stress test on June 19, 2006. Plaintiff underwent single-vessel coronary artery bypass surgery and was discharged on July 3, 2006 in stable condition. (Tr. 361-72)

Michael J. Stevenson, D.O., examined Plaintiff on April 3, 2007 for complaints of back pain after a work-related back injury. Plaintiff complained of muscle spasms and a deep burning sensation in the lumbar area. Dr. Stevenson assessed back pain and ordered x-rays and an MRI. He also prescribed Flexeril and ordered Plaintiff to work light duty with no lifting over 10 pounds until Dr. Stevenson could review the MRI results. Plaintiff returned to Dr. Stevenson on April 9, 2007. Plaintiff reported that his back did not feel any better. Dr. Stevenson prescribed Skalaxin. (Tr. 280, 536-39)

An MRI of the thoracic spine performed on April 23, 2007 revealed the thoracic vertebrae and intervertebral discs to be generally normal in appearance. In addition, Dr. George Pjura noted Schmorl's node endplate defects in the inferior endplates of T7 and T9 and modest desiccative changes in the T7-8 and T9-10 discs, as well as prominent lateral osteophytes at the T7-8 level. The MRI showed no evidence of spinal canal or neural foraminal stenosis at any of the reviewed levels or of disc impingement of the cord or exiting nerve roots. An MRI of the lumbar spine was essentially normal with modest disc intrusion into the inferior portions of the foramina at L4-5. (Tr. 282-85)

Plaintiff returned to Dr. Stevenson on May 1, 2007. Plaintiff reported sharp pains in his lower back and burning in his mid-back. He felt about the same. Dr. Stevenson assessed back pain, referred Plaintiff to physical therapy, and provided a work excuse with orders to perform light duty with no lifting more than 15 pounds. On May 9, 2007, Plaintiff reported that he was still lifting 50 to 60 pounds at work, as well as bending and stooping. His whole back burned, and he was not sleeping well. Dr. Stevenson advised Plaintiff to take off work for 2 weeks and continue physical therapy. Plaintiff reported improved upper back pain but no improvement in the lower back during a May 29, 2007 appointment. (Tr. 286-96)

On February 14, 2008, Plaintiff saw Dr. Stevenson for a workers compensation office visit. Plaintiff complained of low back pain radiating up his back, as well as tingling and pain in his right leg, worse with driving. Dr. Stevenson noted that Plaintiff was in no acute distress and that he had no pain or palpation of the lumbar spine. Dr. Stevenson was unable to reproduce the alleged pain down Plaintiff's leg during the exam. He released Plaintiff to work with no lifting greater than 15 pounds for 2 weeks. On February 26, 2008, Dr. Stevenson drafted a letter indicating that Plaintiff

would be out of work through March 23, 2008 at the direction of Plaintiff's physical therapist. (Tr. 297-301)

In March of 2008, Dr. Stevenson noted complaints of pain and numbness in Plaintiff's right leg and back pain. Plaintiff had problems attending physical therapy due to the weather. In addition, Dr. Stevenson referred Plaintiff to a spine specialist and released him to full work duty. He also refilled Plaintiff's Xanax prescription. A March 28, 2008 MRI of the lumbar spine revealed no significant change from the April 23, 2007 MRI; minimal bilateral L3-4 and L4-5 foraminal stenosis due to bulging disc and facet hypertrophy; modest lower lumbar facet hypertrophic degenerative changes; and no significant central spinal canal stenosis. (Tr. 307-09)

Plaintiff saw his primary care physician, Stephen Smith, M.D., on June 18, 2008 for a medication evaluation for hypertension and elevated lipids. Dr. Smith diagnosed arteriosclerotic heart disease and changed Plaintiff's prescription from Zocor to Atenolol. Plaintiff returned to Dr. Smith on June 16, 2009 for complaints of chest pain and ankle swelling. Physical examination revealed parasternal tenderness and trace lower extremity non-pitting edema. Dr. Smith assessed costochondritis. (Tr. 394-96) From July 28 through December 2, 2009, Plaintiff saw Dr. Smith on several occasions. Plaintiff's complaints included burning, tightness, tenderness, and soreness in his chest, as well as pain in his left shoulder, wrist, and hand. Dr. Smith assessed costochondritis, bursitis, and osteoarthritis. (Tr. 439-50)

Plaintiff was treated at the Brain and NeuroSpine Clinic of Missouri for low back and right leg pain from March 31, 2008 through April 8, 2009. On March 31, 2008, Plaintiff's range of motion in his back was normal, and there was no focal tenderness to palpation or evidence of paracervical or paraspinal spasm. Kevin A. Vaught, M.D., opined that any additional diagnostic studies were

unwarranted. He recommended a Medrol Dosepak to be completed then followed up with an anti-inflammatory. In addition, he recommended a consultation with Dr. Annamarie Guidos for continued non-surgical, conservative treatment. Dr. Vaught diagnosed lumbar strain and mild SI joint discomfort. He believed Plaintiff could work on a light duty basis but could not work without restrictions. Dr. Vaught saw no evidence of a surgical lesion involving Plaintiff's lumbar spine, and he informed Plaintiff that he should be optimistic that he will completely improve over time. (Tr. 330-33)

Dr. Guidos evaluated Plaintiff on April 16, 2008. She noted that Plaintiff's pain was isolated in the right SI joint region. Examination revealed normal range of motion in the back with no tenderness or spasm. Dr. Guidos noted no edema in his extremities. Further, she agreed with Dr. Vaught's recommendations for light duty, although Plaintiff did not have a job. She advised Plaintiff to return after an SI joint injection. On May 14, 2008, Plaintiff reported that his back was a little better, but he still complained of low back discomfort. The SI injection helped his anterior thigh pain. Plaintiff also mentioned dysesthesias in the L5 distribution on the right side. Dr. Guidos planned to proceed with nerve conduction EMG study to rule out L5 radiculopathy. He was taken out of work while undergoing the work up. On June 3, 2008, Dr. Guidos noted that Plaintiff was treated successfully for SI joint dysfunction and had improved from that perspective. Plaintiff complained of mild dysesthesias, but he was in no apparent distress. Muscle tests showed normal strength bilaterally, with mild decreased sensation in the L5 distribution in the right lower extremity. Nerve conduction studies revealed a radiculopathy at L5 mostly chronic. Dr. Guidos planned to discuss the study results with Dr. Vaught. (Tr. 323-29)

On July 2, 2008, Dr. Vaught noted some tenderness along Plaintiff's facet complexes at L4-5

and L5-S1. After reviewing previous MRIs, Dr. Vaught saw no evidence of disc herniation or nerve root impingement. However, he noted some evidence of facet arthropathy in the lower lumbar spine. Motor strength, reflexes, and sensory exam were normal. Dr. Vaught did not believe surgical intervention was warranted. He recommended a trial of Neurontin and an evaluation by Dr. Cleaver for pain management with possible facet blocks to the lumbar spine. Dr. Vaught opined that Plaintiff could work light duty with lifting no more than 10 pounds, with no repetitive bending, stooping, or twisting. Plaintiff should drive no more than 15 minutes. (Tr. 320-22)

Dr. Terry L. Cleaver examined Plaintiff on August 21, 2008. Musculoskeletal exam revealed pain in the lower back with extension rotation at 30 degrees but was otherwise unremarkable. Motor exam of lower extremities showed good strength and tone. He had normal sensation to light touch and temperature but some suggestion of distal L5 dermatomal sensation, on the right greater than left. Dr. Cleaver performed an interlaminar epidural steroid injection at the L5-S1 level. On September 12, 2008, Dr. Cleaver performed another epidural injection at L4-5 bilateral and at L5-S1 bilateral on September 29, 2008. Plaintiff reported worsening pain after the injection on October 14, 2008. Dr. Cleaver scheduled a radiofrequency rhizotomy of the medial branch innervation at the L3-4, L4-5, and L5-S1 levels. On December 4 and 26, 2008, Dr. Cleaver performed a lumbar radiofrequency rhizotomy. (Tr. 314-19, 546-53)

On April 8, 2009, Plaintiff reported 50% improvement but complained of discomfort at times when standing and doing activities. He listed his medications as Atenolol, Vytorin, Aspirin, Ibuprofen, and fish oil caplets. Examination of the lumbar and thoracic spine was normal, with no tenderness on palpation or spasm. Straight leg raise testing was negative, and sensation in the lower extremities was normal. Dr. Guidos released Plaintiff from care with instructions that he could return

11

to work with restrictions of lifting no more than 50 pounds and no frequent bending, standing, climbing, walking, squatting, or sitting. (Tr. 390-93)

Dr. Patrick J. Lecorps, an orthoeadic surgeon, examined Plaintiff on August 14, 2008 for an independent medical examination. Plaintiff complained of some back pain irradiating to the right buttock and posterior right leg, but he was in no acute distress. He rated his pain as a 7 but was able to ambulate with no pain and bend over. hyperextension of the lumbosacral spine was limited due to muscle spasms. Lateral flexion and deep tendon reflexes of the knees were normal bilaterally. Straight leg raising test was 60 degrees on both sides. A prior MRI showed no evidence of a herniated disc, degenerative disc disease, disc space narrowing, facet joint arthropathy, or spondylolisthesis. Dr. Lecorps saw no positive findings on the MRI. His impression was chronic lumbosacral myofasciitis with lumbar radiculopathy on the right side of minimal degree that should respond to epidural steroid injections. Dr. Lecorps was unsure whether the pain was directly related to the 2007 injury. (Tr. 540-41)

Phillip W. Taylor, M.D., examined Plaintiff on February 16, 2010, at the request of Dr. Smith. Plaintiff complained of low back pain for 2 years and a little pain in the knees, radial border of the wrists, the ankles, and the fifth toes for the past 4 months. He also complained of one hour of morning stiffness. Motor strength, reflexes, and sensation were normal in upper and lower extremities. He displayed no limitation of motion, pain on motion, crepitation, subluxation, or effusion of any joint in either of the upper or lower extremities. However, Plaintiff did have tenderness at the base of both thumbs and a little swelling on the medial, posterior aspect of the left ankle. Dr. Taylor assessed degenerative disc disease of the lumbar spine; knee pain possibly radiating from the back; probable osteoarthritis of the first CMC joints; and history of coronary artery bypass

graft (CABG) surgery. Dr. Taylor recommended continued follow up with the pain clinic and lumbar exercises, and he suggested the Plaintiff consult his heart surgeon about the chest pain. (Tr. 575-76)

Plaintiff presented to the ER at Twin Rivers Regional Medical Center on May 8, 2009 for complaints of dizziness. He also reported chest pain and anxiousness. Physical examination was essentially unremarkable. Plaintiff was diagnosed with acute anxiety. He was discharged with symptoms completely resolved and pain-free, along with a prescription for Ativan. Plaintiff returned to the ER on November 26, 2009. He complained of left wrist pain. Examination of his wrist showed moderate tenderness to palpation and diffuse tenderness over entire left wrist without localization. X-rays showed no acute bony abnormality. Plaintiff was discharged with a diagnosis of myofascial strain and a prescription for Percocet. (Tr. 474-87)

Melinda Huggins, a single decision-maker, completed a Physical Residual Functional Capacity Assessment on October 15, 2008. She opined that Plaintiff could lift 10 pounds occasionally and frequently; stand and/or walk about 6 hours in an 8-hour work day; sit for about 6 hours; and push and/or pull without limitation. He could only occasionally stoop. No other limitations were established by the evidence. (Tr. 336-42)

Marsha Toll, PsyD, completed a Psychiatric Review Technique on October 23, 2008. Dr. Toll found no medically determinable impairment. She noted that Plaintiff alleged no psychological impairments and was able to socialize. Although Plaintiff had been prescribed Xanax, no diagnosis of anxiety or any other psychological disorder was in the file, and he did not list Xanax as a medication he took. Dr. Toll found that the totality of the evidence in the file did not warrant additional psychological development. (Tr. 342-52)

## IV. The ALJ's Determination

In a decision dated April 22, 2010, the ALJ found that Plaintiff met the insured status requirement of the Social Security Act through December 31, 2013. He had not engaged in substantial gainful activity since February 10, 2008, the alleged onset date. His severe impairments were degenerative disc disease of the lumbar spine and coronary artery disease. Because Plaintiff had never sought psychiatric or psychological treatment, nor had his mental status deteriorated such that psychiatric hospitalization was required, the ALJ found that Plaintiff failed to establish a severe mental impairment. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, SubpartP, Appendix 1, Part A. (Tr. 10-14)

After careful consideration of the entire record, the ALJ found that the Plaintiff had the residual functional capacity ("RFC") to perform light work except for lifting and carrying more than 20 pounds occasionally and 10 pounds frequently; standing or walking more than 6 hours in an 8-hour work day; sitting more than 6 hours in an 8-hour work day; and climbing or crouching more than occasionally. The ALJ considered Plaintiff's symptoms to the extent they were consistent with objective medical evidence and other evidence. The ALJ also considered Plaintiff's testimony, the testimony of his wife, his work record, and his daily activities. The ALJ determined that the severity of Plaintiff's subjective complaints were not supported by or consistent with the objective medical evidence, which included conservative treatment and non-narcotic pain medication. In addition, the ALJ found that Plaintiff was capable of performing past relevant work as a small auto parts machine operator as Plaintiff actually performed it because that work did not require the performance of work-related activities precluded by Plaintiff's RFC. Even if the ALJ gave Plaintiff the maximum benefit

of the doubt, he could still perform essentially the full range of unskilled, sedentary work. Thus, the ALJ concluded that Plaintiff was not under a disability from February 10, 2008 through the date of the decision. (Tr. 15-19)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838

(8th Cir. 1992)).  Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence.  Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s).  Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record.  Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995).  It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence.  Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's

complaints under the <u>Polaski</u>[1] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. <u>Marciniak</u>, 49 F.3d at 1354.

## VI. Discussion

Plaintiff raises seven arguments in his brief. First, Plaintiff asserts that the ALJ erred in relying on the non-examining consultant to find that Plaintiff did not suffer from a severe mental impairment. Next, Plaintiff argues that the ALJ failed to properly develop the record by not ordering a psychological consultation. Plaintiff further claims that the ALJ erred by stating the Plaintiff did not take narcotic pain medication. Plaintiff's fourth argument contends that the ALJ erred by failing to properly consider Plaintiff's complaints of severe chest pain. Fifth, Plaintiff maintains that substantial evidence did not support the ALJ's RFC determination because it failed to include limitations to the use of Plaintiff's hands. For his sixth point, Plaintiff argues that substantial evidence did not support the ALJ's determination that Plaintiff could perform his past relevant work as a parts assembler. Finally, Plaintiff asserts that the ALJ erred in applying the Grids instead of seeking vocational expert testimony because Plaintiff had nonexertional impairments.

Defendant argues that the ALJ properly found that Plaintiff had no severe mental impairments and properly fulfilled his duty to develop the record. Further, Defendant asserts that the ALJ

---

[1]The <u>Polaski</u> factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).

considered appropriate credibility factors in evaluating Plaintiff's subjective complaints. Defendant finally argues that substantial evidence supported the ALJ's determination that Plaintiff could perform his past relevant work and other work in the national economy. After fully considering the entire record and the briefs, the undersigned finds that substantial evidence supports the ALJ's determination such that the decision of the Commissioner denying benefits should be affirmed.

### A. Plaintiff's Mental Impairment

Plaintiff first argues that the ALJ erred in relying on the non-examining consulting psychologist to find that Plaintiff's alleged mental impairment was not severe. The Court disagrees. As stated by the Defendant, the Plaintiff had the burden of establishing a severe medically determinable impairment. Kirby v. Astrue, 500 F.3d 705, 707-08 (8th Cir. 2007). Here, the ALJ noted that Plaintiff's mental status had never deteriorated to the extent he required psychiatric hospitalization, nor had Plaintiff sought or been referred for formal psychiatric treatment. (Tr. 14) Further, the ALJ properly found that the evidence failed to demonstrate that Plaintiff's anxiety imposed significant mental functional limitations. (Tr. 14) The ALJ noted that Plaintiff had no more than mild, if any, restriction with regard to his activities of daily living, interacting with others, and concentration, persistence, or pace. Plaintiff had no episodes of decompensation of an extended duration. If an impairment would have no more than a minimal effect on a plaintiff's ability to work, then the impairment is not severe. Id. at 707.

Further, the fact that a plaintiff was diagnosed on one occasion with anxiety does not mean the impairments are severe. A severe impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities include physical

18

functions; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervisors, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). Here, Plaintiff is able to perform household chores and yard work, socialize, and grocery shop, which demonstrates that Plaintiff's mental impairment causes no more than a mild limitation in activities of daily living; social functioning; and concentration, persistence, and pace. See Buckner v. Astrue, 646 F.3d 549, 555 (8th Cir. 2011) (finding plaintiff's depression was not severe where, *inter alia*, plaintiff engaged in a daily activities that were inconsistent with his allegations). In addition, almost all of the medical records show that he did not complain of any severe mental impairments to medical professionals. Instead, the record indicates that Plaintiff's depression was merely related to life stressors such as paying bills and his relationship with his parents. (Tr. 43) As such, substantial evidence in the record demonstrates that Plaintiff's depression and anxiety were situational and did not result in significant functional restrictions. Dunahoo v. Apfel, 241 F.3d 1033, 1039-1040 (8th Cir. 2001); Shipley v. Astrue, No. 2:09CV36MLM, 2010 WL 1687077, at *12 (E.D. Mo. April 26, 2010).

Plaintiff also contends that the ALJ erred in according too much weight to the non-examining consulting psychologist. "When evaluating a non-examining source's opinion, the ALJ 'evaluate[s] the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources.'" Wildman v. Astrue, 596 F.3d 959, 967 (quoting 20 C.F.R. § 404.1527(d)(3)). The weight given to an opinion from a non-examining source "will depend on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. §§ 404.1527(b)(3), 416.927(b)(3). "The better an explanation a source provides for an opinion, the

more weight we will give that opinion." Id.

Here, Dr. Toll provided a thorough explanation for the opinion rendered in the Psychiatric Review Technique and noted that Plaintiff alleged no psychological impairments and was able to shop, visit with others, and teach Sunday school. Although Plaintiff had been prescribed Xanax, no diagnosis of anxiety or any other psychological disorder was in the file, and he did not list Xanax as a medication he took. (Tr. 352) Dr. Toll's opinion was based on all of the medical evidence on file at that time and on Plaintiff's own subjective allegations. In addition, the record shows that the ALJ did consider Plaintiff's ER visit in 2009, which resulted in an acute anxiety diagnosis and a prescription for Ativan. Thus, the ALJ did not rely solely on the non-examining consultant's opinions but properly considered all of the evidence to determine that Plaintiff did not have a severe mental impairment. See Gray v. Astrue, No. 4:11CV72 FRB, 2012 WL 830477, at *14-15 (E.D. Mo. March 12, 2012) (finding the ALJ did not err in considering the opinion of the non-examining medical consultant where the ALJ considered all of the evidence in the record and accepted the opinion as consistent with such evidence). Therefore, the Court finds that substantial evidence supports the ALJ's finding that Plaintiff's mental impairments were non-severe and thus not disabling.

### B.  Duty to Develop the Record

Next, Plaintiff contends that the ALJ failed to properly develop the record by not ordering a psychological consultation. A social security hearing is a non-adversarial proceeding, and thus an ALJ has a duty to develop the record fully. Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006). An ALJ may order a consultative examination where the evidence as a whole is insufficient to allow the ALJ to make a determination. 20 C.F.R. §§ 404.1519a(b), 416.917, and 416.919a(b). However,

the "'ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995) (quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)).

Here, Dr. Toll noted that the evidence in the file did not warrant additional psychological development. (Tr. 352) In addition, as stated above, the medical evidence demonstrated that Plaintiff functioned well mentally. Indeed, Plaintiff did not list depression or anxiety as a basis for disability on his application. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) ("The fact that [plaintiff] did not allege depression in her application for disability benefits is significant, even if the evidence of depression was later developed."). Although the medical evidence indicated that Plaintiff had received an anti-depressant prescription, Plaintiff had not sought, nor been referred for, professional health treatment. Under Eighth Circuit law, this is insufficient to require further development. Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir.2003) (holding that the fact that the plaintiff had been prescribed antidepressants on at least one occasion was not enough to require the ALJ to order a psychological evaluation). Therefore, the undersigned finds that the ALJ fulfilled his duty to fully and fairly develop the record and did not err by not ordering a consultative examination.

### C.  Consideration of Plaintiff's Credibility in Evaluating Subjective Complaints

Plaintiff's next three arguments pertain to the ALJ's credibility determination in light of Plaintiff's subjective complaints. First, Plaintiff contends that the ALJ erred in relying on the lack of narcotic medication to discredit Plaintiff's allegations of disabling pain. Plaintiff references Tramadol as a narcotic-like pain reliever used to treat moderate to severe pain. (Pl.'s Brief 4, ECF No. 14) Defendant correctly notes that the ALJ accurately stated that Plaintiff did not take narcotic

prescriptions for pain, as Tramadol is "narcotic-like." More importantly, the ALJ did not rely exclusively on the lack of prescription narcotics to discredit the Plaintiff's allegations of disabling pain. Indeed, the ALJ assessed Plaintiff's testimony, his wife's testimony, his medications, his prior work history, his daily activities, and the objective medical evidence. The ALJ then explicitly found that the severity of Plaintiff's subjective complaints were not credible and were not supported by the objective medical evidence. (Tr. 16) An ALJ may discount a plaintiff's complaints where there exist inconsistencies in the record as whole. Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010). Further, courts defer to the ALJ's credibility determination so long as the ALJ explicitly discredits plaintiff's testimony and provides good reason for doing so. Id. (citation and internal quotations omitted). The undersigned thus finds that the ALJ properly took into account Plaintiff's medications in assessing his credibility.

Next, Plaintiff argues that the ALJ erred in failing to properly consider Plaintiff's subjective complaints of severe chest pain. However, the ALJ's opinion belies Plaintiff's assertion. The ALJ did consider Plaintiff's chest pain and found his coronary artery disease to be severe. However, he also noted that Plaintiff's cardiac condition was stable and controlled by medication. (Tr. 16) An impairment that can be controlled by treatment or medication cannot be considered disabling. Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (citation and internal quotations omitted). Further, the ALJ considered Dr. Smith's findings of chest pain and parasternal tenderness, which he noted "cause[d] significant limitation in the claimant's ability to perform basic work activities." (Tr. 12-13) The ALJ's RFC finding accordingly limited Plaintiff to no more than light work. (Tr. 15) "The issue in credibility determination is not whether the claimant actually experiences pain, but whether the claimant's symptoms are credible to the extent that they preclude all substantial gainful activity."

Lewis v. Astrue, No. 4:10CV1131 FRB, 2011 WL 4407728, at *20 (E.D. Mo. Sept. 22, 2011) (citing Baker v. Apfel, 159 F.3d 1140, 1145 (8th Cir. 1998)). "The mere fact that working may cause pain or discomfort does not mandate a finding of disability . . . ." Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) (citation omitted). Therefore, the Court finds that the ALJ properly considered Plaintiff's complaints of severe chest pain.

Plaintiff also contends that substantial evidence did not support the ALJ's RFC finding because it did not include limitations to Plaintiff's use of his hands. The undersigned disagrees. The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). Plaintiff first complained of "wrist pain" during an ER visit at the end of November, 2009 and was diagnosed with myofascial pain. (Tr. 482) X-rays were negative. (Tr. 482) Dr. Taylor suspected osteoarthritis but did not recommend further testing. (Tr. 575) Plaintiff's complaints occurred a mere 3 months prior to his hearing. In addition, while Plaintiff's wife testified at the hearing on March 3, 2010 that Plaintiff had pain in his hands over the past year, nothing in the record supports a finding that Plaintiff's pain lasted or could be expected to last for 12 continuous months.

In addition, the ALJ did acknowledge Plaintiff's complaints of arthritis in his hands. (Tr. 15) The ALJ found that objective medical evidence showed no muscle atrophy or weakness, nor any inflammatory signs. (Tr. 16) The ALJ also noted that other documented impairments "result[ed] in no significant long-term functional limitations or complications." (Tr. 16) Indeed, Plaintiff did not mention osteoarthritis of the hands in his disability application, nor did he claim that his condition

affected the use of his hands hand pain in his function report. (Tr. 148) The fact that Plaintiff failed to list osteoarthritis as a basis for disability is significant in assessing the Plaintiff's functional limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). Because Plaintiff failed to demonstrate that his alleged osteoarthritis was severe, the ALJ properly excluded hand limitations from the RFC assessment. See Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007) ("An impairment is not severe if it amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities.").

### D. Plaintiff's Ability to Perform Past Relevant Work

Plaintiff additionally argues that substantial evidence does not support the ALJ's determination that Plaintiff could perform his past relevant work as an auto parts machine operator. Specifically, Plaintiff asserts that his previous job required him to stand all day, which was contrary to the ALJ's limitations of standing or walking no more than 6 hours in an 8-hour workday. However, Defendant correctly notes that Plaintiff's Work History Report stated that he only stood for 6 hours a day, sat for 2 hours, walked for 3 hours, crouched no more than 2 hours, climbed no more than 1 hour, and lifted no more than 20 pounds. (Tr. 158) Plaintiff's description of his past relevant work as a machine operator, as he performed it, was consistent with the ALJ's RFC finding of light work with restrictions to lifting/carrying 20 pounds occasionally and 10 pounds frequently; walking, standing, or sitting for 6 hours in an 8-hour workday; and only occasionally climbing or crouching. (Tr. 15) "[w]here the evidence shows that a claimant retains the RFC to perform the functional demands and job duties of a particular past relevant job as he or she actually performed it, the claimant should be found to be 'not disabled.'" . SSR 82-61, 1982 WL 31387, at *2 (Soc. Sec. Admin. 1982). Because the RFC determined by the ALJ comports with Plaintiff's past relevant work

as a parts assembler, the way he actually performed it, substantial evidence supports the ALJ's determination that Plaintiff could return to his past relevant work.

## E. Vocational Expert Testimony

Finally, Plaintiff argues that the ALJ erred in failing to utilize a Vocational Expert because Plaintiff suffered from non-exertional psychological impairments. Although this Court finds that the ALJ properly determined that Plaintiff could return to his past relevant work at step four, the undersigned will address Plaintiff's argument that the ALJ erroneously applied the Medical-Vocational Guidelines (Grids). In further support of his determination, the ALJ also found that application of the Grids indicated that Plaintiff could perform the full range of unskilled sedentary work. (Tr. 18)

"In the Eighth Circuit, a denial of benefits at step five for a claimant who suffers from exertional and nonexertional impairments must be based on the testimony of a vocational expert, unless the nonexertional impairments do not significantly diminish the claimant's RFC." Sieveking v. Astrue, 4:07CV986 DDN, 2008 WL 4151674, at *6 (E.D. Mo. Sept. 2, 2008) (citing Draper v. Barnhart, 425 F.3d 1127, 1131-1132 (8th Cir.2005)). As thoroughly discussed above, substantial evidence supports the ALJ's determination that Plaintiff's mental impairments were not severe and did not impose significant functional limitations. (Tr. 14) Therefore, the undersigned finds that the ALJ was not required to elicit Vocational Expert testimony. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) (affirming district court's finding that the ALJ appropriately relied on the Grids to determine claimant was not disabled where the claimant's mental impairment was not

severe).   As such, substantial evidence based upon the record as whole supports the ALJ's determination that Plaintiff was not disabled from February 10, 2008 through the date of the decision.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.  A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this  13th  day of February, 2013.